FILED
United States Court of Appeals
Tenth Circuit

**July 9, 2013**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WALLACE B. RODERICK
REVOCABLE LIVING TRUST,
Trustee Amanda Roderick, on behalf
of itself and all others similarly
situated,

      Plaintiff - Appellee,

v.

XTO ENERGY, INC., including
Predecessors, Successors, and
Affiliates,

      Defendant - Appellant.

No. 12-3176

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:08-CV-01330-JTM-KMH)**

---

Stephen G. Masciocchi (and Marcy G. Glenn of Holland & Hart, L.L.P., Denver,
Colorado; James C.T. Hardwick and Mark Banner of Hall, Estill, Hardwick,
Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, on the briefs), for Defendant -
Appellant.

Rex A. Sharp (and Barbara C. Frankland of Gunderson, Sharp & Walke, L.L.P.,
on the briefs), Prairie Village, Kansas, for Plaintiff - Appellee.

---

Before **KELLY**, **McKAY,** and **MATHESON**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Defendant-Appellant XTO Energy Inc. (XTO) appeals from the district court's order certifying a class of Kansas royalty owners, represented by Plaintiff-Appellee Wallace B. Roderick Revocable Living Trust (the Trust), who seek recovery for XTO's alleged underpayment of royalties. Specifically, the Trust claims XTO violated Kansas law by improperly deducting costs associated with placing the gas into "marketable condition." The district court certified the class under Federal Rule of Civil Procedure 23(b)(3). The class includes thousands of royalty owners, whose claims are based on approximately 650 leases that cover over 300 wells. We have jurisdiction under 28 U.S.C. § 1292(e) and Fed. R. Civ. P. 23(f). After careful consideration, we vacate the district court's certification order and remand for further proceedings consistent with this opinion.

Background

XTO is an oil and gas company that produces natural gas and its constituent products from wells. I App. 13. The class comprises "[a]ll royalty owners of [XTO] . . . from wells located in Kansas that have produced gas and/or gas constituents (such as residue gas or methane, natural gas liquids, helium, nitrogen or condensate) from January 1, 1999 to present."[1] Wallace B. Roderick

---

[1] Initially, the Trust proposed certification of a class that included royalty owners in Kansas, Oklahoma, and Colorado. See Wallace B. Roderick Revocable

- 2 -

Revocable Living Trust v. XTO Energy, Inc., 281 F.R.D. 477, 479 (D. Kan. 2012). It includes "thousands of royalty owners," approximately 650 leases, and 300-plus wells located across ten different well fields. Aplt. Br. 4–5; see II App. 462–72 (listing XTO accounts in Kansas). The Trust owns royalty interests in eight of the wells and is a party to five leases. III App. 803–04.

On behalf of the class, the Trust brought suit against XTO for breach of contract, unjust enrichment, and an accounting. I App. 34–35. All three causes of action turn on the Trust's central allegation: that XTO has systematically underpaid royalties by deducting costs associated with placing gas (and its constituent products) in marketable condition. I App. 101.

Under Kansas law, oil and gas lessees have an implied duty of marketability (IDM), "[a]bsent a contract providing to the contrary." Sternberger v. Marathon Oil Co., 894 P.2d 788, 800 (Kan. 1995). Pursuant to that duty, lessees are obligated to bear the full cost of production expenses, such as gathering, compression, dehydration, treatment, and processing ("GCDTP" services), which are "undertaken to transform gas into a marketable product." Id.

The Trust argues that all raw gas from class members' wells must undergo "*one or more* of the GCDTP Services to make the raw gas marketable." Aplee.

---

Living Trust v. XTO Energy, Inc., 281 F.R.D. 477, 479 (D. Kan. 2012). The Colorado claims were subsequently dropped, and the Oklahoma claims were severed and transferred to the Chieftain Royalty Co. v. XTO Energy, Inc. action in the Eastern District of Oklahoma. Id.

Br. 10.[2]  For instance, according to the Trust's expert, "residue gas bound for the interstate transmission system must meet the transmission line quality standards before entering that market."  III App. 746.  Both parties agree that "[n]either XTO nor any affiliate owns or operates a gas gathering system or processing plant in Kansas pertaining to the class wells."  Aplt Br. 13; see I App. 103 n.4.  Instead, XTO has marketing contracts with third parties.  See I App. 103–04, 108–09.  Under these marketing contracts, "XTO compensates the third party by (a) paying a cash fee coupled with some in-kind transfer, (b) supplying a percentage of the proceeds or an index price to pay for the gathering and process, or (c) using some combination of these methods."  Roderick, 281 F.R.D. at 480; see III App. 747.  XTO also claims to sell some gas "directly to interstate pipelines without processing."  Aplt. Br. 13.

Calculation of royalty payments to all class members is made using XTO's accounting system, Avatar.  I App. 260.  Each well is assigned a unique number and name.  Id. at 262.  However, Avatar does not consider "anything . . . in connection with the payment of [the] royalty owner that is based on . . . specific language in a lease."  Id. at 273–75.  Instead, "[r]emittances are determined by the terms contained in XTO's contract with the purchaser of the gas or gas-related product."  Roderick, 281 F.R.D. at 480.  The Trust claims that XTO improperly

_____

[2]  The district court described the GCDTP services in general terms, without making findings as to which services are applied to a particular stream of gas.  See Roderick, 281 F.R.D. at 479–80.

deducts (i.e., "netbacks") costs from royalty payments, effectively sharing with royalty owners those costs associated with making gas marketable. See I App. 108–09 ("Distilled to its essence, [XTO's] methodology is Starting Commercial Price of each component minus Netback Charges set forth in gas marketing contracts.").

XTO opposes class certification on two key grounds. First, XTO claims each lease must be examined individually to determine whether the IDM has been negated. To demonstrate the necessity of a lease-by-lease inquiry, XTO sampled one-fifth of the class's leases, categorizing those leases by royalty type.[3] III App. 804, 904–16. According to XTO's expert, the sample yielded twenty different categories of royalty provisions, several of which negate the IDM completely or in part (i.e., by providing for certain express deductions). Id. at 1031–60. Second, XTO claims that pinpointing where a marketable product is obtained will require "a well-by-well analysis." Aplt. Br. 37. According to XTO, some gas may be marketable at the well, while other gas may require GCDTP services to be made marketable. Id. (citing Sternberger, 894 P.2d at 800). Thus, XTO argues "there is no one universal point of marketability." Id. at 36.

The district court concluded that the proposed class satisfied the requirements of Rule 23(a) and certified the class under Rule 23(b)(3). Roderick,

---

[3] According to XTO, "Plaintiff's counsel declined XTO's invitation to review XTO's lease files, and to the best of XTO's knowledge has still not reviewed XTO's leases." III App. 808 n.3.

281 F.R.D. at 487. Although the Trust offered a number of questions allegedly common to the class, the district court rested its certification decision on one common issue: whether XTO's uniform payment methodology breached the implied duty of marketability under Kansas law. Id. at 479, 484 (declining to address the "other common claims"). XTO timely filed a petition for permission to appeal, which we granted. XTO Energy, Inc. v. Wallace B. Roderick Revocable Living Trust, No. 12-602 (10th Cir. June 26, 2012). On appeal, XTO argues the district court abused its discretion by concluding the proposed class satisfied Rule 23(a)'s commonality, typicality, and adequacy requirements, and Rule 23(b)(3)'s predominance requirement.

## Discussion

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2550 (2011) (quotation omitted). Rule 23 sets forth the prerequisites to class certification. Rule 23(a) requires the party seeking certification to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect

the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

In addition, "[t]he party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013). Here, the class sought and was granted certification under Rule 23(b)(3), which requires the court to find that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," (predominance); and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority). Fed. R. Civ. P. 23(b).

"We review the standard the district court used in making its Rule 23 determination de novo and the merits of that determination for an abuse of discretion." Vallario v. Vandehey, 554 F.3d 1259, 1264 (10th Cir. 2009). Material misapplication of the Rule 23 factors constitutes an abuse of discretion. Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004).

I.      Rule 23(a)

Rule 23 is more than a pleading standard. Wal-Mart, 131 S. Ct. at 2551. Hence, the "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Id. Further, the district court has an independent obligation to conduct a "rigorous analysis" before concluding that Rule 23's requirements have been satisfied. Id.

- 7 -

(quotation omitted). Often that analysis requires looking at the merits of a plaintiff's claims. See id.

Here, the district court's analysis of Rule 23(a)'s commonality requirement is in tension with the rule that "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). Specifically, the district court applied a less demanding standard whereby "[c]lass certification requirements are liberally construed, and doubts may be resolved in favor of certification." Roderick, 281 F.R.D. at 480. Further, the court may have altered the burden of proof by requiring XTO to disprove commonality. Relaxing and shifting Rule 23(a)'s "strict burden of proof," Tabor v. Hilti, Inc., 703 F.3d 1206, 1228 (10th Cir. 2013) (quotation omitted), results in an abuse of discretion, see Vallario, 554 F.3d at 1267.

The Trust claims, and the district court agreed, that XTO's uniform payment methodology establishes the requisite Rule 23(a) commonality. See Aplee. Br. 19 ("Either XTO's uniform 'netback' royalty methodology is correct or it is not."). However, the mere raising of a common question does not automatically satisfy Rule 23(a)'s commonality requirement. Rather, the common contention "must be of such a nature that it is capable of *classwide resolution*—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551 (emphasis added).

XTO argues the legality of its uniform payment methodology is *not* capable of classwide resolution. According to XTO, answering the "common question" in this case actually requires two separate, individualized inquiries: (1) "Is there an implied duty to obtain a marketable product under the terms of a particular royalty owner's lease?"; and (2) "If so, when has a marketable product been obtained?" III App. 806.

The Trust claims there is an implied duty of marketability in every class member's lease. Aplee. Br. 26–28. The problem, however, is that the Trust has not shown—and the district court did not specifically find—that the duty exists classwide. The district court assumed the IDM was present in each lease because XTO "failed to point to any lease provision unambiguously negating . . . the existence of any implied duty of marketability." Roderick, 281 F.R.D. at 483. But given known variations in lease language, we think it was the Trust's burden to affirmatively demonstrate commonality on the implied duty of marketability. See Wal-Mart, 131 S. Ct. at 2551; Vallario, 554 F.3d at 1268–69 (citing Fed. R. Civ. P. 23, 2003 Amendment advisory committee note ("A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.")). As our sister circuit has explained, "it is not the defendant who bears the burden of showing that the proposed class does not comply with Rule 23, but [rather] the plaintiff who bears the burden of showing that the class does comply with Rule 23." Thorn v. Jefferson-Pilot Life

Ins. Co., 445 F.3d 311, 321 (4th Cir. 2006) (emphases omitted).[4]

To be sure, the district court considered many of XTO's arguments regarding lease language variations. But from what we are told, there are roughly 430 leases which have yet to be examined by the Trust or the district court. Aplt. Br. 39; cf. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998) ("[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts . . . . [where the contracts] contain[] materially different [] language."). On remand, the Trust could, for example, create a chart classifying lease types, see, e.g., Foster v. Merit Energy Co., 282 F.R.D. 541, 551 n.12 (W.D. Okla. 2012), and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM.

The Trust also argues that the marketability issue can be resolved classwide. According to the Trust, either "all of the gas is in marketable condition at the wellhead . . . or none of it is in marketable condition at the

---

4 Relying on Farrar v. Mobil Oil Corp., the district court concluded that individual testimony regarding parties' intent or the circumstances of lease formation would be unnecessary. See Roderick, 281 F.R.D. at 483, 486 (citing 234 P.3d 19, 30 (Kan. Ct. App. 2010)). The district court did not, however, consider whether *language within the four corners of each lease* would need to be examined individually. And while Farrar appears to have disclaimed the "need for individualized examination of lease . . . language," 234 P.3d at 31, Farrar is not dispositive. First, Farrar did not involve Fed. R. Civ. P. 23. Second, Farrar's conclusion must be evaluated in light of Wal-Mart and Comcast, particularly given the fact that Farrar upheld certification despite finding some leases "expressly abrogate[d] the implied covenant." Id.

wellhead." Aplee. Br. 19. XTO, on the other hand, claims "there is no one universal point of marketability." Aplt. Br. 36. According to XTO, resolving the issue of marketability will require a well-by-well analysis. Id. at 37–38 ("These issues cannot be decided in one stroke for all class members as to all [300 plus] wells.").

Once gas is in marketable condition, the IDM is satisfied—regardless of whether a market exists at that location. See Sternberger, 894 P.2d at 800. And the Kansas Supreme Court has recognized that gas may be marketable *at the well*. See id. Thus, if gas is in marketable condition at the mouth of "Well A" but not "Well B," XTO's deductions likely would be proper for Well A's royalty owners, but a breach of the IDM for Well B's royalty owners. In other words, the propriety of XTO's deductions might vary by well, depending on gas quality. On remand, the district court should consider whether and to what extent marketability affects commonality.[5]

Finally, because the commonality, typicality, and adequacy requirements of Rule 23(a) "tend to merge," see Wal-Mart, 131 S. Ct. at 2551 n.5 (quoting Falcon, 457 U.S. at 157 n.13), the district court on remand should consider whether the

---

[5] To the extent the district court concluded that XTO "conceded the existence of a . . . uniform policy of charging royalty owners deductions for rendering gas marketable," Roderick, 281 F.R.D. at 482, we are not so sure. While XTO has not challenged the existence of a uniform payment policy, it has consistently denied taking deductions (at least classwide deductions) for *rendering the gas marketable*. See, e.g., I App. 70–76, III App. 813–15.

issues we have identified have any effect on its typicality or adequacy findings.

II.    Rule 23(b)

Rule 23(b) also demands a "rigorous analysis."  See Falcon, 457 U.S. at 161.  As the Supreme Court recently emphasized in Comcast v. Behrend, the district court has a "duty to take a close look at whether common questions predominate over individual ones."  133 S. Ct. at 1432 (quotation omitted).  Further, the Comcast Court made clear that it may be necessary for a district court to probe behind the pleadings before deciding whether Rule 23(b)'s requirements have been met.  Id. at 1432–33 (district court abused its discretion by failing to entertain arguments regarding damages, "simply because those arguments would also be pertinent to the merits").

Here, the district court found Rule 23(b)'s predominance requirement satisfied because "[c]ommon issues as to royalty charges predominate over individual matters."  Roderick, 281 F.R.D. at 486.  In its brief discussion, the district court reasoned that "the focus of the present action is upon the actions of XTO, and substantial evidence as to individual issues is unlikely."  Id.

Every proposed class action "must be decided on its own facts, on the basis of practicalities and prudential considerations."  Reed v. Bowen, 849 F.2d 1307, 1309–10 (10th Cir. 1988) (quotation omitted).  At this point, predominance is not established simply by virtue of a uniform payment methodology.  See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d

- 12 -

1159, 1170 (11th Cir. 2010) ("A plaintiff may claim that every putative class member was harmed by the defendant's conduct, but if fewer than all of the class members enjoyed the legal right that the defendant allegedly infringed, or if the defendant has non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones."); see also Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 326–29 (5th Cir. 2008) (trial court must look beyond defendant's common course of conduct to consider "how a trial on the merits would be conducted if a class were certified" (quotation omitted)).

Without limiting the scope of the district court's predominance inquiry, we advise the district court to consider in its predominance analysis the same issues discussed *supra* relating to Rule 23(a) commonality (i.e., lease language and marketability). We note that Rule 23(b)(3)'s predominance criterion is "far more demanding" than Rule 23(a)'s commonality requirement. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623–24 (1997).

Additionally, the district court should consider the extent to which material differences in damages determinations will require individualized inquiries. Although "individualized monetary claims belong in Rule 23(b)(3)," Wal-Mart, 131 S. Ct. at 2558, predominance may be destroyed if individualized issues will overwhelm those questions common to the class, see Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) ("To be sure, individualized damage

determinations cut against class certification under Rule 23(b)(3).”); Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598, 602 (5th Cir. 2006); see also McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 231 (2d Cir. 2008), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) (“[W]hile the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification . . . it is nonetheless a factor we must consider in deciding whether issues susceptible to generalized proof ‘outweigh’ individual issues.” (citations omitted)).

That said, there are ways to preserve the class action model in the face of individualized damages. See, e.g., Comcast, 133 S. Ct. at 1437 & n.* (Ginsburg, J. and Breyer, J., dissenting) (“A class may be divided into subclasses for adjudication of damages. Fed. R. Civ. Pro[]. 23(c)(4)–(5). Or, at the outset, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings.”). But we believe the district court is in the best position to evaluate the practical difficulties which inhere in the class action format, and is especially suited to tailor the proceedings accordingly.

III.    Collateral and Judicial Estoppel

Finally, we reject the Trust’s invitation to apply collateral or judicial estoppel. The Trust argues XTO should be estopped from litigating class certification issues here based on XTO’s previous settlement in another royalty class action. Aplee. Br. 49–53 (citing Fankhouser v. XTO Energy, Inc., No. CIV-

- 14 -

07-798-L, 2010 WL 5256807 (W.D. Okla. Dec. 16, 2010) (order certifying class), and No. CIV-07-798-L, 2012 WL 4867715 (W.D. Okla. Oct. 12, 2012) (final order approving class action settlement)).

"[J]udicial estoppel is 'an equitable doctrine invoked by a court at its discretion.'" Kaiser v. Bowlen, 455 F.3d 1197, 1204 (10th Cir. 2006) (quoting New Hampshire v. Maine, 532 U.S. 742, 750 (2001)). Likewise, the decision to apply offensive collateral estoppel lies within the court's "broad discretion." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979). It "is not available as a matter of right." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 772 (1st Cir. 2010) (quoting 18A Wright, Miller & Cooper, Federal Practice & Procedure § 4465 (2d ed. 2010)).

First, we do not believe the Trust has met its burden of showing the issues in this case are identical to those in the Fankhouser action.[6] See Dodge v. Cotter Corp., 203 F.3d 1190, 1198–99 (10th Cir. 2000) (collateral estoppel requires identity of issues). Therefore, collateral estoppel is not appropriate, nor is judicial estoppel. See Johnson v. Lindon City Corp., 405 F.3d 1065, 1069 (10th Cir. 2005) (judicial estoppel requires party's current position to be "clearly

---

[6] For example, unlike the present action, Fankhouser involved the Timberland Gathering System, which is "[t]he only gathering system owned or operated by Defendant and its affiliates in Kansas." I App. 103. In fact, the Fankhouser court relied upon "the contention that defendant improperly paid royalties based on a sale *between affiliated companies*," as the "*single issue common to the class*." Fankhouser, 2010 WL 5256807, at *3 (emphases added).

inconsistent" with its earlier position). Further, the Trust has not addressed the stipulation contained in the <u>Fankhouser</u> settlement, which prohibits use of the settlement "for any purpose in any subsequent litigation against XTO." Supp. App. 187.

Finally, we believe the district court should have the opportunity to consider the certification issues in light of the Supreme Court's decisions in <u>Wal-Mart</u> and <u>Comcast</u>. <u>See</u> <u>Spradling v. City of Tulsa</u>, 198 F.3d 1219, 1222–23 (10th Cir. 2000). Although the <u>Fankhouser</u> settlement was not approved until October 2012, the court certified the <u>Fankhouser</u> class in March 2009, well before <u>Wal-Mart</u> and <u>Comcast</u> were decided. Thus, we decline to exercise our equitable power to estop XTO's opposition to class certification in the present case.

For the foregoing reasons, we VACATE the district court's class certification order and REMAND for further proceedings consistent with this opinion.